UNITED STATES of America,
Appellee,

v.

SHI YAN LIU, a/k/a Simon
Liu, Defendant,

Jie Hu and Shao Zhen Lin,
Defendants–Appellants.

Docket Nos. 00–1037(L), 00–1038(CON).

United States Court of Appeals,
Second Circuit.

Argued Oct. 18, 2000.

Decided Dec. 27, 2000.

Joel B. Rudin, New York, NY, for defendant-appellant Jie Hu.

Jeremy Gutman, New York, NY, for defendant-appellant Shao Zhen Lin.

Michael Gilbert, Assistant United States Attorney for the Southern District of New York (Kevin S. Reed, Jamie L. Kogan, and Christine H. Chung, Assistant United States Attorneys, on the brief), for appellee.

Before MESKILL, CABRANES, and POOLER, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge:

Defendants Jie Hu and Shao Zhen Lin appeal from judgments of conviction entered by the District Court (Sidney H. Stein, *Judge* ) on January 25, 2000. For the reasons stated below, we affirm the judgments.

The following facts are not in dispute. At all relevant times, Hu and Lin were employees of a New York immigration assistance agency ("the agency"). On October 2, 1996, Wing Fung Chau, a government informant posing as an undocumented alien, met with Hu at the agency. During the meeting, Chau signed a blank copy of Immigration and Naturalization Service ("INS") Form I–589, an application for political asylum, and left it at the agency. Chau subsequently spoke with Lin. The content of Chau's conversations with Hu and Lin is discussed below to the extent relevant.

On November 8, 1996, the agency filed a completed asylum application with the INS on Chau's behalf. The completed application contained an allegedly fictitious account of Chau's persecution in China.

On July 8, 1997, a grand jury in the Southern District of New York returned an indictment that charged Hu and Lin with conspiring to file fraudulent political asylum applications in violation of 18 U.S.C. § 371.[1] On July 10, 1997, United States Magistrate Judge Theodore H. Katz issued a search warrant ("the warrant") authorizing INS agents to search the agency. The agents did so, and seized various materials. Hu and Lin then moved to suppress these materials, and on November 16, 1998, the District Court denied their motion in a ruling from the bench.

A trial followed, and on July 22, 1999, the jury returned its verdicts, convicting both Hu and Lin on one count each of conspiring to submit fraudulent political asylum applications to the INS in violation of 18 U.S.C. § 371, and on two counts each of preparing and filing fraudulent political asylum applications in violation of 18 U.S.C. § 1546. The District Court entered judgment accordingly, and this timely appeal followed.

1. Subsequently filed superseding indictments added counts of, *inter alia,* preparing and filing fraudulent asylum applications in violation of 18 U.S.C. § 1546.

On appeal, Hu and Lin press four substantial arguments, none of which is persuasive.

## I.

First, appellants contend that their motion to suppress should have been granted because the warrant issued by Magistrate Judge Katz was insufficiently particular. We disagree. A warrant must be "sufficiently specific to permit the rational exercise of judgment [by the executing officers] in selecting what items to seize." *United States v. LaChance,* 788 F.2d 856, 874 (2d Cir.1986) (internal quotation marks omitted). The warrant here met this standard. It identified the statute that had allegedly been violated, and authorized only the seizure of a relatively narrow range of items—namely, "[d]ocuments containing fraudulent statements in relation to political asylum applications, fraudulent birth certificates, 'boiler—plate' political asylum applications, fictitious stories outlining political persecution, [and] receipts and financial records relating to these asylum applications, including computer records."

## II.

Appellants next argue that the INS agents' search was conducted in "flagrant disregard" of the warrant so that *all* fruits of the search must be suppressed. Again, we disagree.

Government agents "flagrantly disregard" the terms of a warrant so that wholesale suppression is required only when (1) they effect a "widespread seizure of items that were not within the scope of the warrant," *United States v. Matias,* 836 F.2d 744, 748 (2d Cir.1988), and (2) do not act in good faith, *see Marvin v. United States,* 732 F.2d 669, 675 (8th Cir.1984) (holding that complete suppression is inappropriate where government "agents attempted to stay within the boundaries of the warrant and ... the extensive seizure of documents was prompted largely by practical considerations and time constraints"); *United States v. Lambert,* 771 F.2d 83, 93 (6th Cir.1985) (similar); *United States v. Tamura,* 694 F.2d 591, 597 (9th Cir.1982) (similar); *United States v. Heldt,* 668 F.2d 1238, 1269 (D.C.Cir.1981) (similar); *see also United States v. Foster,* 100 F.3d 846, 852 (10th Cir.1996) (ordering blanket suppression when "at the time he obtained the warrant, [the officer who applied for it] ... knew that the limits of the warrant would not be honored"); *United States v. Rettig,* 589 F.2d 418, 423 (9th Cir.1978) (similar).

The cornerstone of the blanket suppression doctrine is the enduring aversion of Anglo American law to so-called general searches. Such searches—which have been variously described as "wide—ranging exploratory searches," *Maryland v. Garrison,* 480 U.S. 79, 84, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987), and "indiscriminate rummaging[s]," *United States v. George,* 975 F.2d 72, 75 (2d Cir.1992)—are especially pernicious, and "have long been deemed to violate fundamental rights." *Marron v. United States,* 275 U.S. 192, 195, 48 S.Ct. 74, 72 L.Ed. 231 (1927); *see also, e.g., Go–Bart Importing Co. v. United States,* 282 U.S. 344, 357, 51 S.Ct. 153, 75 L.Ed. 374 (1931) ("Since before the creation of our government, [general] searches have been deemed obnoxious to fundamental principles of liberty. They are denounced in the constitutions or statutes of every State in the Union. The need of protection against them is attested alike by history and present conditions." (internal citation omitted)). Eliminating general searches was the basic impetus for the Fourth Amendment's Warrant Clause, *see Garrison,* 480 U.S. at 84, 107 S.Ct. 1013, and the instruments that authorized government agents to conduct such searches were much-reviled throughout the colonial period.[2]

2. During that period, general searches were conducted pursuant to, *inter alia,* general warrants and writs of assistance. *See Vernonia School District 47J v. Acton,* 515 U.S. 646,

The rationale for blanket suppression is that a search that greatly exceeds the bounds of a warrant and is not conducted in good faith is essentially indistinguishable from a general search. *See United States v. Squillacote,* 221 F.3d 542, 556 (4th Cir.2000) (collecting cases); *cf. United States v. Dzialak,* 441 F.2d 212, 217 (2d Cir.1971) (describing law enforcement officers as conducting a "general search" when "[i]n executing what was a very precise warrant, the[y] spent more than four hours ransacking a[ ] house for any possible incriminating evidence," and "[o]f the items seized, those which were not described in the warrant far outnumbered those described"). Accordingly, to satisfy the first prong of the two-part test described above, the search conducted by government agents must *actually resemble* a general search. [3] *See Heldt,* 668 F.2d at 1262 (declining to require "complete suppression" when conduct of government agents did not "result[ ] in a general search"); *Rettig,* 589 F.2d at 423 (ordering blanket suppression where, "[a]s interpreted and executed by the [searching] agents, th[e] warrant became an instrument for conducting a general search"). *See generally Dzialak,* 441 F.2d at 217 (describing a general search).

Here, appellants claim, *inter alia,* that government agents seized some asylum application files without first determining that they contained "fraudulent statements," as required by the warrant. Accordingly, appellants argue, Judge Stein erred in not granting their motion for wholesale suppression.

We are not persuaded. At a suppression hearing, the INS agent who supervised the search testified—credibly, Judge Stein found—as follows: during the search he spent approximately 30 minutes reviewing asylum application files contained in agency file cabinets; of the files he reviewed in that time, "pretty much all of the[m]" listed the asylum applicant's address as 55–03 Van Doren Street; such repetition of one address indicated that the applications might include fraudulent statements; and he ordered all files in the file cabinets seized—even the ones that he had not individually searched.

These actions bear none of the hallmarks of a general search: They suggest a fairly systematic inventory, not "indiscriminate rummaging," and a search for items enumerated in the warrant, not an "exploratory" search for items not mentioned there. Indeed, federal courts have repeatedly held that such actions as were taken by the INS agents in this case, standing alone, do not support a finding that government agents have flagrantly

669, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (O'Connor, J., dissenting) (collecting sources). To great acclamation in the American colonies, Chief Justice Pratt (later Lord Camden) criticized general warrants on the ground that they would permit "the secret cabinets and bureaus of every subject in this kingdom [to] be thrown open to the search and inspection of a messenger." *Entick v. Carrington,* 19 How. St. Tr. 1029, 1063 (C.P.1765); *see also Wilkes v. Wood,* 19 How. St. Tr. 1153 (C.P. 1763) (similar). *See generally* William J. Stuntz, *The Substantive Origins of Criminal Procedure,* 105 Yale L.J. 393, 397 (1995) (noting that Lord Camden became "famous" throughout the colonies for these views). Similarly, in a 1761 argument before a Boston court, James Otis, the Massachusetts lawyer and legislator, described the writs of assistance "as the worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of law, that was ever found in an English law book." James Otis, Speech on the Writs of Assistance (1761), *in* 1 John Wesley Hall, Jr., Search and Seizure 7 n. 35 (2d ed.1991). John Adams later characterized Otis's argument to the court as the precise moment when "the child Independence was born." *See Boyd v. United States,* 116 U.S. 616, 625, 6 S.Ct. 524, 29 L.Ed. 746 (1886). *See generally* Thomas Davis, *Recovering the Original Fourth Amendment,* 98 Mich. L.Rev. 547, 561 n. 20 (1999) (describing dissemination of Otis's argument in the colonies).

3. To satisfy the second prong, it is not the search *itself* that must resemble a general search. Rather, the search must resemble a general search in the sense that it—like a general search—is not conducted in good faith.

disregarded the terms of a warrant. *See, e.g., United States v. Hargus,* 128 F.3d 1358, 1363 (10th Cir.1997) (holding that where government agents were authorized by a warrant to search for "broad categories" of documentary evidence, and records belonging to each category were found in every drawer of some file cabinets, the officers did not "grossly exceed" the terms of the warrant when they seized *entire* file cabinets so that complete suppression was required) (collecting cases).

Accordingly, even assuming *arguendo* that the INS agents exceeded the bounds of the warrant when they seized individual agency files without first searching them, we hold that appellants have not shown that the agents' search resembled a general search. We therefore conclude that the first prong of the two-part test for flagrantly disregarding the terms of the warrant has not been satisfied, and wholesale suppression—a remedy that we have described as "drastic," *Matias,* 836 F.2d at 747—is not required here. *See generally Foster,* 100 F.3d at 852 (observing that "the extreme remedy of blanket suppression should only be imposed in the most extraordinary of cases" (internal quotation marks omitted)).

In light of our conclusion that the first prong of the applicable test has not been satisfied, we do not reach the question of whether the proper approach to "good faith" in this context is objective or subjective. *Compare, e.g., United States v. Leon,* 468 U.S. 897, 922 n. 23, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (describing a "good-faith inquiry ... confined to the *objectively* ascertainable question [of] whether a reasonably well trained officer would have known that the search was illegal") (emphasis added), *with* Deluxe Black's Law Dictionary 693 (6th ed.1990) (defining "good faith" in a subjective fashion as, *inter alia,* "an honest belief, the absence of malice").

### III.

Appellants' third argument is that the evidence was insufficient to support the jury's conspiracy verdict because it failed to establish the existence of an agreement between Hu and Lin. We believe, however, that a rational juror could have found that such an agreement existed. *See generally Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (holding that a verdict must be sustained against a sufficiency of the evidence challenge if "*any* rational trier of fact could have found the essential elements of the [charged] crime beyond a reasonable doubt"); *United States v. Pitre,* 960 F.2d 1112, 1121 (2d Cir.1992) (noting that deference to a jury's verdict is "especially important when reviewing a conviction of conspiracy .... because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel" (internal quotation marks and citations omitted)). A rational juror could have found beyond a reasonable doubt that at his October 2, 1996 meeting with Chau, Hu outlined three "persecution stories" for possible use in Chau's asylum application; picked one of these stories for use in the application, not because it was true, but because it was most likely to induce the INS to grant Chau asylum; and directed Chau to sign a blank application form so that agency personnel could write the persecution story on the application and file it on Hu's behalf. Furthermore, based on the transcripts of Lin's conversations with Chau, a rational juror could have inferred that Hu told Lin about this conversation, and that Hu and Lin then agreed to complete and file the fraudulent application together. For example, on October 24, 1996, Chau spoke by telephone with Lin, who had apparently acquired Chau's file; during that conversation, Lin expressed reluctance to process the application after Chau said that he had not been persecuted in China, but agreed to do so after Chau told her that the "previous person" had said that

the application could be filed in "this way."

## IV.

Finally, appellants argue that the District Court should not have given a *Pinkerton* charge. *See generally Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *United States v. Romero,* 897 F.2d 47, 51 (2d Cir.1990) (noting that under a *Pinkerton* theory of liability, a "conspirator can be held responsible for the substantive crimes committed by his co-conspirators to the extent those offenses were reasonably foreseeable consequences of acts furthering the unlawful agreement, even if he did not himself participate in the substantive crimes"). A *Pinkerton* charge should not be given where "the jury is required to resort to the inversion of *Pinkerton* and infer the existence of a conspiracy from a series of disparate criminal offenses." *United States v. Salameh,* 152 F.3d 88, 149 (2d Cir.1998) (internal quotation marks omitted). Here, however, there was sufficient evidence, independent of the substantive counts, from which the jury could have found beyond a reasonable doubt that Hu and Lin conspired to file a fraudulent application on Chau's behalf. Moreover, this was not a case in which the jury found that defendants had participated in a "series of disparate criminal offenses." Rather, the jury convicted defendants on two substantive counts, each of which was directly related to the filing of fraudulent asylum applications on behalf of Chau. Finally, the District Court instructed the jurors that they could consider a *Pinkerton* theory of liability only if they *first* determined that the charged conspiracy existed, and that defendants were members of it. *See id.* at 149–50 (upholding use of *Pinkerton* charge where "the district court cautiously instructed the jury that [defendant] could be found guilty of the substantive crimes only after the jury had concluded that he was a conspirator"); *United States v. Harwood,* 998 F.2d 91, 100 (2d Cir.1993) (similar).

## CONCLUSION

To summarize, we hold that:

(1) the warrant was not insufficiently particular;

(2) INS agents did not flagrantly disregard the terms of the warrant because the search they conducted bears none of the hallmarks of a general search;

(3) the evidence was sufficient to support the jury's finding that a conspiratorial agreement existed between Hu and Lin; and

(4) the *Pinkerton* charge was not erroneously given.

We have considered appellants' remaining arguments, and conclude that they are without merit.

Accordingly, the judgments entered by the District Court are AFFIRMED.