Judge HALL concurs in part and dissents in part in a separate opinion.
CHIN, Circuit Judge:
In this case, defendant-appellant Stavros M. Ganias appeals from a judgment convicting him, following a jury trial, of tax evasion. He challenges the conviction on the grounds that his Fourth Amendment rights were violated when the Government copied three of his computer hard drives *128 pursuant to a search warrant and then retained files beyond the scope of the warrant for more than two-and-a-half years. He also contends that his right to a fair trial was violated when, during the trial, a juror posted comments about the case on his Facebook page and “friended” another juror. We reject the second argument but hold that the Government’s retention of the computer records was unreasonable. Accordingly, we vacate the conviction and remand for further proceedings.

STATEMENT OF THE CASE

A. The Facts [1]
In the 1980s, after working for the Internal Revenue Service (“IRS”) for some fourteen years, Ganias started his own accounting business in Wallingford, Connecticut. He provided tax and accounting services to individuals and small businesses. In 1998, he began providing services to James McCarthy and two of McCarthy’s businesses, American Boiler and Industrial Property Management (“IPM”). IPM had been hired by the Army to provide maintenance and security at a vacant Army facility in Stratford, Connecticut.
In August 2003, the Criminal Investigative Command of the Army received a tip from a confidential source that individuals affiliated with IPM were engaging in improper conduct, including stealing copper wire and other items from the Army facility and billing the Army for work that IPM employees performed for American Boiler. The source alleged that evidence of the wrongdoing could be found at the offices of American Boiler and IPM, as well as at the offices of “Steve Gainis [sic],” who “perform[ed] accounting work for IPM and American Boiler.”[2]
Based on this information, the Army commenced an investigation. Army investigators obtained several search warrants, including one to search the offices of Gani-as’s accounting business. The warrant, issued by the United States District Court for the District of Connecticut and dated November 17, 2003, authorized the seizure from Ganias’s offices of:
All books, records, documents, materials, computer hardware and software and computer associated data relating to the business, financial and accounting operations of [IPM] and American Boiler....
The warrant was executed two days later. Army computer specialists accompanied investigators to Ganias’s offices and helped gather the electronic evidence. The agents did not seize Ganias’s computers; instead, the computer specialists made identical copies, or forensic mirror images, of the hard drives of all three of Ganias’s computers. As a consequence, the investigators copied every file on all three computers — including files beyond the scope of the warrant, such as files containing Ganias’s personal financial records. Ganias was present as the investigators collected the evidence, and he expressed concern about the scope of the seizure. In response, one agent “assured” Ganias that the Army was only looking for files “related to American Boiler and IPM.” Everything else, the agent explained, “would be purged once they completed their search” for relevant files.
*129 Back in their offices, the Army computer specialist copied the data taken from Gani-as’s computers (as well as data obtained from the searches of the offices of IPM and American Boiler) onto “two sets of 19 DVDs,” which were “maintained as evidence.” Some eight months later, the Army Criminal Investigation Lab finally began to review the files.
In the meantime, while reviewing the paper documents retrieved from Ganias’s offices, the Army discovered suspicious payments made by IPM to an unregistered business, which was allegedly owned by an individual who had not reported any income from that business. Based on this evidence, in May 2004, the Army invited the IRS to “join the investigation” of IPM and American Boiler and gave copies of the imaged hard drives to the IRS so that it could conduct its own review and analysis. The Army and the IRS proceeded, separately, to search the imaged hard drives for files that appeared to be within the scope of the warrant and to extract them for further review.
By December 2004, some thirteen months after the seizure, the Army and IRS investigators had isolated and extracted the computer files that were relevant to IPM and American Boiler and thus covered by the search warrant. The investigators were aware that, because of the constraints of the warrant, they were not permitted to review any other computer records. Indeed, the investigators were careful, at least until later, to review only data covered by the November 2003 warrant.
They did not, however, purge or delete the non-responsive files. To the contrary, the investigators retained the files because they “viewed the data as the government’s property, not Mr. Ganias’s property.” Them view was that while items seized from an owner will be returned after an investigation closes, all of the electronic data here were evidence that were to be protected and preserved. As one agent testified, “[W]e would not routinely go into DVDs to delete data, as we’re altering the original data that was seized. And you never know what data you may need in the future.... I don’t normally go into electronic data and start deleting evidence off of DVDs stored in my evidence room.” The computer specialists were never asked to delete (or even to try to delete) those files that did not relate to IPM or American Boiler.
In late 2004, IRS investigators discovered accounting irregularities regarding transactions between IPM and American Boiler in the paper documents taken from Ganias’s office. After subpoenaing and reviewing the relevant bank records in 2005, they began to suspect that Ganias was not properly reporting American Boiler’s income. Accordingly, on July 28, 2005, some twenty months after the seizure of his computer files, the Government officially expanded its investigation to include possible tax violations by Ganias. Further investigation in 2005 and early 2006 indicated that Ganias had been improperly reporting income for both of his clients, leading the Government to suspect that he also might have been underreporting his own income.
At that point, the IRS case agent wanted to review Ganias’s personal financial records and she knew, from her review of the seized computer records, that they were among the files in the DVDs copied from Ganias’s hard drives. The case agent was aware, however, that Ganias’s personal financial records were beyond the scope of the November 2003 warrant, and consequently she did not believe that she could review the non-responsive files, even though they were already in the Government’s possession.
*130 In February 2006, the Government asked Ganias and his counsel for permission to access certain of his personal files that were contained in the materials seized in November 2003. Ganias did not respond, and thus, on April 24, 2006, the Government obtained another warrant to search the preserved images of Ganias’s personal financial records taken in 2003. At that point, the images had been in the Government’s possession for almost two- and-a-half years. Because Ganias had altered the original files shortly after the Army executed the 2003 warrant, the evidence obtained in 2006 would not have existed but for the Government’s retention of those images.
B. Procedural History
1. The Indictment
In October 2008, a grand jury indicted Ganias and McCarthy for conspiracy and tax evasion. The grand jury returned a superseding indictment in December 2009, containing certain counts relating to McCarthy’s taxes and two counts relating to Ganias’s personal taxes. The latter two counts were asserted only against Ganias. The case was assigned to Chief Judge Alvin W. Thompson.
2. The Motion to Suppress
In February 2010, Ganias moved to suppress the computer files that are the subject of this appeal. In April 2010, the district court (Thompson, J.) held a two-day hearing and, on April 14, 2010, it denied the motion, with an indication that a written decision would follow. On June 24, 2011, the district court filed its written decision explaining the denial of Ganias’s motion to suppress. See United States v. Ganias, No. 3:08 Cr. 224, 2011 WL 2532396 (D.Conn. June 24, 2011).

3.The Trial

In April 2010, the case was transferred to Judge Ellen Bree Burns for trial. In May 2010, the district court severed the two counts against Ganias for tax evasion with respect to his personal taxes from the other charges.[3]
Trial commenced on March 8, 2011, with jury selection, and testimony was scheduled to begin on March 10, 2011. At 9:34 p.m. on March 9, the evening before the start of the evidence, one of the jurors, Juror X, posted a comment on his Face-book page: “Jury duty 2morrow. I may get 2 hang someone ... can’t wait.”
Juror X’s posting prompted responses from some of his online “friends,” including: “gettem while the’re young !!! lol” and “let’s not be to hasty. Torcher first, then hang! Lol.” During the trial, Juror X continued to post comments about his jury service, including:
March 10 at 3:34 pm:
Shit just told this case could last 2 weeks. Jury duty sucks!
March 15 at 1:41 pm:
Your honor I object! This is way too boring, somebody get me outta here.
March 17 at 2:07 pm:
Guiness for lunch break. Jury duty ok today.
During the second week of trial, Juror X became Facebook friends with another one of the jurors.
On April 1, 2011, the jury convicted Ga-mas on both counts. Later that evening, at 9:49 pm, Juror X posted another comment on his Facebook page: “(GUILTY:).” He later elaborated:
I spent the whole month of March in court. I ,do believe justice prevailed! It *131 was no cake walk getting to the end! I am glad it is over and I have a- new experience under my belt!
4. The Motion for a New Trial
On August 17, 2011, Ganias moved for a new trial based on alleged juror misconduct. On August 30, 2011, the district court (Burns, /.) held an evidentiary hearing and took testimony from Juror X. The district court denied the motion (as well as a request for the further taking of evidence) in a decision filed on October 5, 2011. See United States v. Ganias, No. 3:08 Cr. 224, 2011 WL 4738684 (D.Conn. Oct. 5, 2011).
At the post-trial evidentiary hearing, Juror X explained that he posted the comment on his Facebook page about “hanging] someone” as “a joke, all friend stuff,” and that he was “[j]ust joking, joking around.” At first he could not recall whether he had any conversations with the other juror, with whom he became Face-book friends during the trial, outside the court. He later clarified, however, that he did not have any conversations with the other juror during the course of the trial, prior to deliberations, about the subject matter of the case. He also testified that he in fact considered the case fairly and impartially. The district court accepted Juror X’s testimony, found that he was credible, and concluded that he had participated in the deliberations impartially and in good faith.
5. Sentencing
On January 5, 2012, the district court (Burns, J.) sentenced Ganias principally to twenty-four months’ imprisonment. This appeal followed. Ganias was released pending appeal.

DISCUSSION

Ganias raises two issues on appeal: first, he contends that his Fourth Amendment rights were violated when the Government seized his personal computer records and then retained them for more than two-and-a-half years; and, second, he contends that he was entitled to a new trial because of the jury’s improper use of social media.
As to the Fourth Amendment issue, we review the district court’s findings of fact for clear error, viewing the evidence in the light most favorable to the Government, and its conclusions of law de novo. United States v. Ramos, 685 F.3d 120, 128 (2d Cir.), cert. denied, —— U.S. -, 133 S.Ct. 567, 184 L.Ed.2d 369 (2012). As to the issue of the district court’s denial of Gani-as’s motion for a new trial for alleged juror misconduct, we review for abuse of discretion. United States v. Farhane, 634 F.3d 127, 168 (2d Cir.), cert. denied, — U.S. -, 132 S.Ct. 833, 181 L.Ed.2d 542 (2011).
Although we vacate Ganias’s conviction on the Fourth Amendment grounds, we address his juror misconduct claim because the increasing popularity of social media warrants consideration of this question. We address the juror misconduct question first, as it presents less difficult legal issues, and we then turn to the Fourth Amendment question.
A. Juror’s Improper Use of Social Media
1. Applicable Law
Defendants have the right to a trial “by an impartial jury.” U.S. Const, amend. VI. That right is not violated, however, merely because a juror places himself in a “potentially compromising situation.” United States v. Aiello, 771 F.2d 621, 629 (2d Cir.1985), abrogated on other grounds by Rutledge v. United States, 517 *132 U.S. 292, 116 S.Ct. 1241, 134 L.Ed.2d 419 (1996); see also Smith v. Phillips, 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) (“[I]t is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.”). A new trial will be granted only if “the juror’s ability to perform her duty impartially has been adversely affected,” Aiello, 771 F.2d at 629, and the defendant has been “substantially prejudiced” as a result, United States v. Fumo, 655 F.3d 288, 305 (3d Cir.2011). Although courts are understandably reluctant to invade the sanctity of the jury’s deliberations, the trial judge should inquire into a juror’s partiality where there are reasonable grounds to believe the defendant may have been prejudiced. United States v. Schwarz, 283 F.3d 76, 97 (2d Cir.2002); United States v. Sun Myung Moon, 718 F.2d 1210, 1234 (2d Cir.1983). That inquiry should end, however, as soon as it becomes apparent that those reasonable grounds no longer exist. See Sun Myung Moon, 718 F.2d at 1234.
B. Application
A juror who “friends” his fellow jurors on Facebook, or who posts comments about the trial on Facebook, may, in certain circumstances, threaten a defendant’s Sixth Amendment right to an impartial jury.[4] Those circumstances, however, are not present here. The district court inquired into the matter and credited Juror X’s testimony that he deliberated impartially and in good faith. The district judge’s credibility determination was not clearly erroneous, and thus she did not abuse her discretion in denying the motion for a new trial.
This case demonstrates, however, that vigilance on the part of trial judges is warranted to address the risks associated with jurors’ use of social media. The Third Circuit has endorsed the use of jury instructions like those proposed by the Judicial Conference Committee on Court Administration and Case Management. See Fumo, 655 F.3d at 304-05. We do so as well.
The Committee proposes that, before trial, the district judge give an instruction that includes the following:
I know that many of you use cell phones, Blackberries, the internet and other tools of technology. You also, must not talk to anyone about this case or use these tools to communicate electronically with anyone about the case. This includes your family and friends. You may not communicate with anyone about the case on your cell phone, through e-mail, Blackberry, iPhone, text messaging, or on Twitter, through any blog or website, through any internet chat room, or by way of any other social networking websites, including Face-book, My Space, Linkedln, and YouTube.[5]
*133 The Committee also recommends giving a similar instruction at the close of the case:
During your deliberations, you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic device or media, such as a telephone, cell phone, smart phone, iPhone, Blackberry or computer; the internet, or any internet service, or any text or instant messaging service; or any internet chat room, blog, or website, such as Facebook, My Space, Linkedln, YouTube or Twitter, to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict.[6]
Here, while the district court gave an appropriate instruction at the start of the jury’s deliberations, it does not appear that it did so earlier. As demonstrated by this case, instructions at the beginning of deliberations may not be enough. We think it would be wise for trial judges to give the Committee’s proposed instructions both at the start of trial and as deliberations begin, and to issue similar reminders throughout the trial before dismissing the jury each day. While situations like the one in this case will not always require a new trial, it is the better practice for trial judges to be proactive in warning jurors about the risks attending their use of social media.
B. The Seizure and Retention of Gani-as’s Computer Records
1. Applicable Law
The Fourth Amendment protects the rights of individuals “to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.” U.S. Const, amend. IV; see, e.g., United States v. Ramirez, 523 U.S. 65, 71, 118 S.Ct. 992, 140 L.Ed.2d 191 (1998). A search occurs when the Government acquires information by either “physically intruding on persons, houses, papers, or effects,” or otherwise invading an area in which the individual has a reasonable expectation of privacy. See Florida v. Jardines, — U.S. -, 133 S.Ct. 1409, 1414, 185 L.Ed.2d 495 (2013) (internal quotation mark omitted); see also Katz v. United States, 389 U.S. 347, 360-61, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). A seizure occurs when the Government interferes in some meaningful way with the individual’s possession of property. United States v. Jones, — U.S. -, 132 S.Ct. 945, 951 n. 5, 181 L.Ed.2d 911 (2012). Subject to limited exceptions,[7] a search or seizure conducted without a warrant is presumptively unreasonable. See Kyllo v. United States, 533 U.S. 27, 31, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001).
We must construe the Fourth Amendment “in [] light of what was deemed an unreasonable search and seizure when it was adopted, and in a manner which will conserve public interests as well as the interests and rights of individual citizens.” Kyllo, 533 U.S. at 40, 121 S.Ct. 2038. Applying 18th Century notions about searches and seizures to modern technology, however, is easier said than done, as we are asked to measure Government actions taken in the “computer age” against Fourth Amendment frameworks crafted long before this technology exist *134 ed.[8] As we do so, we must keep in mind that “the ultimate touchstone of the Fourth Amendment is reasonableness.” Missouri v. McNeely, — U.S. -, 133 S.Ct. 1552, 1569, 185 L.Ed.2d 696 (2013) (Roberts, C.J., concurring in part and dissenting in part) (internal quotation marks omitted). Because the degree of privacy-secured to citizens by the Fourth Amendment has been impacted by the advance of technology, the challenge is to adapt traditional Fourth Amendment concepts to the Government’s modern, more sophisticated investigative tools.
“The chief evil that prompted the framing and adoption of the Fourth Amendment was the ‘indiscriminate searches and seizures’ conducted by the British ‘under the authority of general warrants.’ ” United States v. Galpin, 720 F.3d 436, 445 (2d Cir.2013) (quoting Payton v. New York, 445 U.S. 573, 583, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)) (internal quotation marks omitted). General warrants were ones “not grounded upon a sworn oath of a specific infraction by a particular individual, and thus not limited in scope and application.” Maryland v. King, — U.S. -, 133 S.Ct. 1958, 1980, 186 L.Ed.2d 1 (2013). The British Crown had long used these questionable instruments to enter a political opponent’s home and seize all his books and papers, hoping to find among them evidence of criminal activity. See Stanford v. Texas, 379 U.S. 476, 482-83, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965). The Framers abhorred this practice, believing that “papers are often the dearest property a man can have” and that permitting the Government to “sweep away all papers whatsoever,” without any legal justification, “would destroy all the comforts of society.” Entick v. Carrington, 95 Eng. Rep. 807, 817-18 (C.P.1765).[9]
The Fourth Amendment guards against this practice by providing that a warrant will issue only if: (1) the Government establishes probable cause to believe the search will uncover evidence of a specific crime; and (2) the warrant states with particularity the areas to be searched and the items to be seized. Galpin, 720 F.3d at 445. The latter requirement, in particular, “makes general searches ... impossible” because it “prevents the seizure of one thing under a warrant describing another.” Id. at 446 (quoting Marron v. United States, 275 U.S. 192, 196, 48 S.Ct. 74, 72 L.Ed. 231 (1927)) (internal quotation marks omitted). This restricts the Government’s ability to remove all of an individual’s papers for later examination because it is generally unconstitutional to seize any item not de *135 scribed in the warrant. See Horton v. California, 496 U.S. 128, 140, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); United States v. Tamura, 694 F.2d 591, 595 (9th Cir.1982). Certain exceptions have been made in those “comparatively rare instances where documents [we]re so intermingled that they [could not] feasibly be sorted on site.” Tamura, 694 F.2d at 595-96. But in those cases, the off-site review had to be monitored by a neutral magistrate and nonresponsive documents were to be returned after the relevant items were identified. Id. at 596-97.
These Fourth Amendment protections apply to modern computer files. Like 18th Century “papers,” computer files may contain intimate details regarding an individual’s thoughts, beliefs, and lifestyle, and they should be similarly guarded against unwarranted Government intrusion. If anything, even greater protection is warranted. See, e.g., Galpin, 720 F.3d at 446 (“[A]dvanees in technology and the centrality of computers in the lives of average people have rendered the computer hard drive akin to a residence in terms of the scope and quantity of private information it may contain.”); United States v. Otero, 563 F.3d 1127, 1132 (10th Cir.2009) (“The modern development of the personal computer and its ability to store and intermingle a huge array of one’s personal papers in a single place increases law enforcement’s ability to conduct a wide-ranging search into a person’s private affairs .... ”); Orin S. Kerr, Searches and Seizures in a Digital World, 119 Harv. L.Rev. 531, 569 (2005) (explaining that computers have become the equivalent of “postal services, playgrounds, jukeboxes, dating services, movie theaters, daily planners, shopping malls, personal secretaries, virtual diaries, and more”).
Not surprisingly, the ability of computers to store massive volumes of information presents logistical problems in the execution of search warrants. It is “comparatively” commonplace for files on a computer hard drive to be “so intermingled that they cannot feasibly be sorted on site.” Tamura, 694 F.2d at 595. As evidenced by this case, forensic analysis of electronic data may take months to complete. It would be impractical for agents to occupy an individual’s home or office, or seize an individual’s computer, for such long periods of time. It is now also unnecessary. Today, advancements in technology enable the Government to create a mirror image of an individual’s hard drive, which can be searched as if it were the actual hard drive but without interfering with the individual’s use of his home, computer, or files.
In light of the significant burdens on-site review would place on both the individual and the Government, the creation of mirror images for offsite review is constitutionally permissible in most instances, even if wholesale removal of tangible papers would not be. Indeed, the 2009 amendments to the Federal Rules of Criminal Procedure, which added Rule 41(e)(2)(B), clearly contemplated off-site review of computer hard drives in certain circumstances.[10] Although Rule 41(e)(2)(B) was not in effect in 2003, when *136 the warrant was executed with respect to Ganias’s computers, case law both before and after the rule’s adoption has recognized that off-site review of seized electronic files may be necessary and reasonable. See, e.g., United States v. Schesso, 730 F.3d 1040, 1046 (9th Cir.2013); United States v. Evers, 669 F.3d 645, 652 (6th Cir.2012); United States v. Hill, 459 F.3d 966, 976-77 (9th Cir.2006); United States v. Upham, 168 F.3d 532, 535 (1st Cir.1999).
The off-site review of these mirror images, however, is still subject to the rule of reasonableness. See, e.g., Ramirez, 523 U.S. at 71, 118 S.Ct. 992 (“The general touchstone of reasonableness which governs Fourth Amendment analysis governs the method of execution of the warrant.” (citation omitted)). The advisory committee’s notes to the 2009 amendment of the Federal Rules of Criminal Procedure shed some light on what is “reasonable” in this context. Specifically, the committee rejected “a presumptive national or uniform time period within which any subsequent off-site copying or review of the media or electronically stored information would take place.” Fed.R.Crim.P. 41(e)(2)(B) advisory committee’s notes to the 2009 Amendments. The committee noted that several variables — storage capacity of media, difficulties created by encryption or electronic booby traps, and computer-lab workload — influence the duration of a forensic analysis and counsel against a “one size fits all” time period. Id. In combination, these factors might justify an off-site review lasting for a significant period of time. They do not, however, provide an “independent basis” for retaining any electronic data “other than [those] specified in the warrant.” United States v. Comprehensive Drug Testing, Inc., 621 F.3d 1162, 1171 (9th Cir.2010) (en banc).
Even where a search or seizure violates the Fourth Amendment, the Government is not automatically precluded from using the unlawfully obtained evidence in a criminal prosecution. United States v. Julius, 610 F.3d 60, 66 (2d Cir.2010). “To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.” Herring v. United States, 555 U.S. 135, 144, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009). Suppression is required “only when [agents] (1) ... effect a widespread seizure of items that were not within the scope of the warrant, and (2) do not act in good faith.” United States v. Shi Yan Liu, 239 F.3d 138, 140 (2d Cir.2000) (internal quotation marks and citations omitted).
The Government effects a “widespread seizure of items” beyond the scope of the warrant when the Government’s search “resemble[s] a general search.” Id. at 140-41. Government agents act in good faith when they perform “searches conducted in objectively reasonable reliance on binding appellate precedent.” Davis v. United States, — U.S. -, 131 S.Ct. 2419, 2423-24, 180 L.Ed.2d 285 (2011). When Government agents act on “good-faith reliance [o]n the law at the time of the search,” the exclusionary rule will not apply. United States v. Aguiar, 737 F.3d 251, 259 (2d Cir.2013). “The burden is on the government to demonstrate the objective reasonableness of the officers’ good faith reliance.” United States v. Voustianiouk, 685 F.3d 206, 215 (2d Cir.2012) (internal quotation marks omitted).
Furthermore, evidence will be suppressed only where the benefits of deterring the Government’s unlawful actions appreciably outweigh the costs of suppressing the evidence — “a high obstacle for those urging ... application” of the *137 rule. Herring, 555 U.S. at 141, 129 S.Ct. 695; see Pennsylvania Bd. of Prob. & Parole v. Scott, 524 U.S. 357, 364-65, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998) (citing United States v. Payner, 447 U.S. 727, 734, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980)). “The principal cost of applying the [exclusionary] rule is, of course, letting guilty and possibly dangerous defendants go free-something that ‘offends basic concepts of the criminal justice system.’ ” Herring, 555 U.S. at 141, 129 S.Ct. 695 (quoting United States v. Leon, 468 U.S. 897, 908, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)).
2. Analysis
This case presents a host of challenging issues, but we need not address them all. The parties agree that the personal financial records at issue in this appeal were not covered by the 2003 warrant, and that they had been segregated from the responsive files by December 2004, before the Government began to suspect that Ganias was personally involved in any criminal activity. Furthermore, on appeal, Ganias does not directly challenge the Government’s practice of making mirror images of computer hard drives when searching for electronic data, but rather challenges the reasonableness of its off-site review. Accordingly, we need not address whether: (1) the description of the computer files to be seized in the 2003 warrant was stated with sufficient particularity, see, e.g., Galpin, 720 F.3d at 449-50; (2) the 2003 warrant authorized the Government to make a mirror image of the entire hard drive so it could- search for relevant files off-site; or (3) the resulting off-site sorting process was unreasonably long.
Instead, we consider a more limited question: whether the Fourth Amendment permits officials executing a warrant for the seizure of particular data on a computer to seize and indefinitely retain every file on that computer for use in future criminal investigations. We hold that it does not.
If the 2003 warrant authorized the Government to retain all the data on Ganias’s computers on the off-chance the information would become relevant to a subsequent criminal investigation, it would be the equivalent of a general warrant. The Government’s retention of copies of Gani-as’s personal computer records for two- and-a-half years deprived him of exclusive control over those files for an unreasonable amount of time. This combination of circumstances enabled the Government to possess indefinitely personal records of Ganias that were beyond the scope of the warrant while it looked for other evidence to give it probable cause to search the files. This was a meaningful interference with Ganias’s possessory rights in those files and constituted a seizure within the meaning of the Fourth Amendment. See United States v. Place, 462 U.S. 696, 708, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (detaining a traveler’s luggage while awaiting the arrival of a drug-sniffing dog constituted a seizure); see also Soldal v. Cook Cnty., 506 U.S. 56, 62-64, 68, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992) (explaining that a seizure occurs when one’s property rights are violated, even if the property is never searched and the owner’s privacy was never violated); Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (“The power to exclude has traditionally been considered one of the most treasured strands in an owner’s bundle of property rights.”).
We conclude that the unauthorized seizure and retention of these documents was unreasonable. The Government had no warrant authorizing the seizure of Ganias’s personal records in 2003. By December 2004, these documents had been separated *138 from those relevant to the investigation of American Boiler and IPM. Nevertheless, the Government continued to retain them for another year-and-a-half until it finally developed probable cause to search and seize them in 2006. Without some independent basis for its retention of those documents in the interim, the Government clearly violated Ganias’s Fourth Amendment rights by retaining the files for a prolonged period of time and then using them in a future criminal investigation.
The Government offers several arguments to justify its actions, but none provides any legal authorization for its continued and prolonged possession of the non-responsive files. First, it argues that it must be allowed to make the mirror image copies as a matter of practical necessity and, according to the Government’s investigators, those mirror images were “the government’s property.” As explained above, practical considerations may well justify a reasonable accommodation in the manner of executing a search warrant, such as making mirror images of hard drives and permitting off-site review, but these considerations do not justify the indefinite retention of non-responsive documents. See Comprehensive Drug Testing, Inc., 621 F.3d at 1171. Without a warrant authorizing seizure of Ganias’s personal financial records, the copies of those documents could not become ipso facto “the government’s property” without running afoul of the Fourth Amendment.
Second, the Government asserts that by obtaining the 2006 search warrant, it cured any defect in its search of the wrongfully retained files. But this argument “reduces the Fourth Amendment to a form of words.” Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920). In Silverthome, the Government, “without a shadow of authority!!,] went to the office of [the defendants’] company and made a clean sweep of all the books, papers and documents found there.” Id. at 390, 40 S.Ct. 182. The originals were eventually returned because they were unlawfully seized, but the prosecutor had made “[p]hotographs and copies of material papers” and used these to indict the defendants and obtain a subpoena for the original documents. Id. at 391, 40 S.Ct. 182. Justice Holmes succinctly summarized the Government’s argument supporting the constitutionality of its actions as follows:
[Although of course its seizure was an outrage which the Government now regrets, it may study the papers before it returns them, copy them, and then may use the knowledge that it has gained to call upon the owners in a more regular form to produce them; that the protection of the Constitution covers the physical possession but not any advantages that the Government can gain over the object of its pursuit by doing the forbidden act.
Id. Unsurprisingly, the Supreme Court rejected that argument: “The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all” unless some exception applies.[11] Id. at 392, 40 S.Ct. 182. The same *139 rationale applies here. If the Government could seize and retain non-responsive electronic records indefinitely, so it could search them whenever it later developed probable cause, every warrant to search for particular electronic data would become, in essence, a general warrant.
Third, the Government argues that it must be permitted to search the mirror images in its possession because the evidence no longer existed on Ganias’s computers. But the ends, however, do not justify the means. The loss of the personal records is irrelevant in this case because the Government concedes that it never considered performing a new search of Ganias’s computers and did not know that the files no longer existed when it searched the mirror images in its possession. And even if it were relevant, the Fourth Amendment clearly embodies a judgment that some evidence of criminal activity may be lost for the sake of protecting property and privacy rights. See, e.g., United States v. Calandra, 414 U.S. 338, 361, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) (“The judges who developed the exclusionary rule were well aware that it embodied a judgment that it is better for some guilty persons to go free than for the [Government] to behave in forbidden fashion.”).
Fourth, the Government contends that returning or destroying the non-responsive files is “entirely impractical” because doing so would compromise the remaining data that was responsive to the warrant, making it impossible to authenticate or use it in a criminal prosecution. Appellee Br. at 34. We are not convinced that there is no other way to preserve the evidentiary chain of custody. But even if we assumed it were necessary to maintain a complete copy of the hard drive solely to authenticate evidence responsive to the original warrant, that does not provide a basis for using the mirror image for any other purpose.
Finally, the Government argues that Ga-nias’s failure to bring a motion for the return of property, pursuant to Federal Rule of Criminal Procedure 41(g), precludes him from seeking suppression now. Although the district court accepted this argument, we find no authority for concluding that a Rule 41(g) motion is a prerequisite to a motion to suppress. See Fed.R.Crim.P. 41(g) (“A person aggrieved ... may move for the property’s return.” (emphasis added)); Fed.R.Crim.P. 41(h) (“A defendant may move to suppress evidence .... ” (emphasis added)). Imposing such a prerequisite makes little sense in this context, where Ganias still had the original computer files and did not need the Government’s copies to be returned to him. Moreover, we fail to see what purpose a Rule 41(g) motion would have served, given the Government’s position that non-responsive files in its possession could not feasibly have been returned or purged anyway.
Because the Government has demonstrated no legal basis for retaining the non-responsive documents, its retention and subsequent search of those documents were unconstitutional. The Fourth Amendment was intended to prevent the Government from entering individuals’ *140 homes and indiscriminately seizing all their papers in the hopes of discovering evidence about previously unknown crimes. See Entick, 95 Eng. Rep. at 817-18; see also Jones, 132 S.Ct. at 949. Yet this is exactly what the Government claims it may do when it executes a warrant calling for the seizure of particular electronic data relevant to a different crime. Perhaps the “wholesale removal” of intermingled computer records is permissible where off-site sorting is necessary and reasonable, Tamura, 694 F.2d at 595-97, but this accommodation does not somehow authorize the Government to retain all non-responsive documents indefinitely, for possible use in future criminal investigations. See Comprehensive Drug Testing, 621 F.3d at 1171.
We turn now to the application of the exclusionary rule. As discussed above, suppression is required when (1) there is a widespread seizure of items not covered by the warrant and (2) agents do not act in good faith. United States v. Shi Yan Liu, 239 F.3d 138, 141 (2d Cir.2000). There must also be a weighing of (3) the benefits of deterrence against (4) the costs of suppression. Herring v. United States, 555 U.S. 135, 141, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009).
First, as we set forth above, the Government effected a widespread seizure of files beyond the scope of the warrant-conduct that resembled an impermissible general search. Shi Yan Liu, 239 F.3d at 141. For almost two-and-a-half years, the Government retained records that were beyond the scope of the 2003 warrant, in violation of Ganias’s Fourth Amendment rights.
Second, the agents here did not act in good faith. Government agents act in good faith when they conduct searches in objectively reasonable reliance on binding appellate precedent. Davis v. United States, — U.S. -, 131 S.Ct. 2419, 2423-24, 180 L.Ed.2d 285 (2011). It is the Government’s burden — not Ganias’s — to demonstrate the objective reasonableness of the officers’ good faith reliance. United States v. Voustianiouk, 685 F.3d 206, 215 (2d Cir.2012). We are not persuaded that the agents in this case reasonably concluded that the 2003 warrant authorized their search of Ganias’s personal records and their retention for more than two years. The agents acknowledged, at least initially, that the Government was obliged to “purge[]” the non-responsive data after they completed their search for relevant files. The record also makes clear that Government investigators “viewed the data as the government’s property” and intentionally retained Ganias’s records for future use. This clearly was not reasonable, and the agents could not have had a good-faith basis to believe the law permitted them to keep the nonresponsive files indefinitely.
Third, the benefits of deterrence in this case are great. With the Government’s use of forensic mirror images becoming increasingly common, deterring its unconstitutional handling of non-responsive data has grown in importance. The substantial deterrence value in this case is clear when compared to Davis, 131 S.Ct. at 2419. In Davis, there was no deterrence value because the police officers conducted their search in compliance with appellate precedent at the time. While Davis’s appeal was pending in the Eleventh Circuit, the Supreme Court overruled that precedent. There was no cause to deter unlawful Government conduct because the conduct was lawful when it occurred. That is not the situation here. In this case, the Government’s handling of Ganias’s personal records violated precedent at the time of the search, and relevant Fourth Amendment law has not fundamentally changed since.
*141 Finally, the costs of suppression are minimal here. This is not a case where a dangerous defendant is being set free. See Herring v. United States, 555 U.S. 135, 144, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009) (“The principal cost of applying the [exclusionary] rule is, of course, letting [a] guilty and possibly dangerous defendant ] go free.”). Even assuming Ganias committed tax evasion — a serious matter — this case does not involve drugs, guns, or contraband. Nor is this a ease where police officers happened upon guns or drugs or other evidence they otherwise could not have found. Rather, early on, the evidence here was readily obtainable by subpoena or search warrant. Moreover, when guns or drugs are suppressed, that evidence is usually irreplaceable. The records here, however, conceivably are available elsewhere as hard copies or can be reconstructed from other records. As made clear by the Government’s behavior, the costs of suppression that the Government has asserted are outweighed by the benefits of deterring future misconduct.
Accordingly, we reverse the denial of the motion to suppress and vacate the judgment of conviction.

CONCLUSION

We conclude that the Government violated Ganias’s Fourth Amendment rights by seizing and indefinitely retaining non-responsive computer records, and then searching them when it later developed probable cause. Accordingly, Ganias’s personal records, seized in the execution of the November 2003 warrant and retained for two-and-a-half years, should have been suppressed. For the reasons stated above, we REVERSE the district court’s denial of the motion to suppress, VACATE the judgment of conviction, and REMAND for further proceedings not inconsistent with this opinion.

. The facts relevant to the issues on appeal are largely undisputed and are drawn from the testimony at the hearing on Ganias's motion to suppress, the decision of the district court (Thompson, J.) denying the suppression motion, and the transcript of the trial.

. The record reflects that Ganias, whose first name is Stavros, was often referred to as "Steve.”

. All the other counts were later dismissed.

. See, e.g., Fumo, 655 F.3d at 331 (Nygaard, J., concurring) ("The availability of the Internet and the abiding presence of social networking now dwarf the previously held concern that a juror may be exposed to a newspaper article or television program.”); United States v. Juror Number One, 866 F.Supp.2d 442, 451 (E.D.Pa.2011) ("[T]he extensive use of social networking sites, such as Twitter and Facebook, have exponentially increased the risk of prejudicial communication amongst jurors and opportunities to exercise persuasion and influence upon jurors.”). See generally Amy. J. St. Eve & Michael A. Zuckerman, Ensuring an Impartial Jury in the Age of Social Media, 11 Duke L. & Tech. Rev. 1 (2012).

. Judicial Conference Comm, on Court Admin. & Case Mgmt., Proposed Model Jury Instructions: The Use of Electronic Technology to Conduct Research on or Communicate about a Case (December 2009), available at *133 www.uscourts.gov/uscourts/News/2010/docs/ DIR10-018-Attachment.pdf.

. Id.

. In this case, the Government has conceded that it needed a warrant to search the non-responsive computer files in its possession and has not argued that any exceptions apply.

. See generally United States v. Jones, - U.S. -, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012) (considering whether placing GPS tracking unit on vehicle constitutes search); Kyllo, 533 U.S. at 27, 121 S.Ct. 2038 (determining whether use of thermal imaging constitutes search); United States v. Aguiar, 737 F.3d 251 (2d Cir.2013) (determining whether warrant-less placement of GPS tracking unit on vehicle fell within good-faith exception to exclusionary rule); United States v. Galpin, 720 F.3d 436 (2d Cir.2013) (analyzing whether warrant to search computer satisfies particularity requirement); Orin S. Kerr, Searches and Seizures in a Digital World, 119 Harv. L.Rev. 531 (2005); James Saylor, Note, Computers as Castles: Preventing the Plain View Doctrine from Becoming a Vehicle for Over-broad Digital Searches, 79 Fordham L.Rev. 2809 (2011); Marc Palumbo, Note, How Safe Is Your Data?: Conceptualizing Hard Drives Under the Fourth Amendment, 36 Fordham Urb. L.J. 977 (2009).

. The Supreme Court has explained that En-tick was "undoubtedly familiar to eveiy American statesman at the time the Constitution was adopted, and considered to be the true and ultimate expression of constitutional law with regard to search and seizure.” Jones, 132 S.Ct. at 949 (internal quotation marks omitted).

. Rule 41(e)(2)(B) provides:
Warrant Seeking Electronically Stored Information. A warrant under Rule 41(e)(2)(A) may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information. Unless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant. The time for executing the warrant in Rule 41(e)(2)(A) and (f)(1)(A) refers to the seizure or on-site copying of the media or information, and not to any later off-site copying or review.
Fed.R.Crim.P. 41(e)(2)(B).

. The Supreme Court has abrogated Silver-thome ’s broad proposition that wrongfully acquired evidence may “not be used at all.” See United States v. Havens, 446 U.S. 620, 624-25, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980) (noting that this evidence may be used for purposes of impeachment); see also Murray v. United States, 487 U.S. 533, 537, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988) (explaining that the "independent source” doctrine allows the admission of "evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the ini *139 tial illegality”); Nix v. Williams, 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (explaining that "inevitable discovery” doctrine permits the admission of unlawfully obtained evidence if "th[at] information ultimately or inevitably would have been discovered by lawful means”). The Government does not rely on any of these exceptions here. Indeed, it concedes that if it "had not preserved that data from the November 2003 seizure, it would have been lost forever.” Appellee's Br. at 33. We do not hold that the Government has waived its right to use the evidence in question for impeachment purposes.